IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

MED SOUTH HEALTH PLANS, LLC; and *
MED-AMERICA BUSINESS SOLUTIONS,
LLC, predecessor in interest,      *

      Plaintiffs,              *

vs.                                *

                             CASE NO. 4:07-CV-134 (CDL)

LIFE OF THE SOUTH INSURANCE       *
COMPANY, a corporation,

                     *

      Defendant.               *

                     *

_____

O R D E R

    This diversity action arises from the contract and resulting business relationship between Plaintiff Med South and Defendant Life of the South Insurance Company ("LOTS").[1] Presently before the Court are Defendant Life of the South Insurance Company's Motion to Dismiss Complaint (Doc. 3) and Amended Motion to Dismiss Complaint (Doc. 4). For the following reasons, these motions are granted.

BACKGROUND

    Accepting all of Med South's allegations as true, and construing all reasonable inferences in its favor, the facts are as follows:

_____

[1]LOTS, a Georgia corporation, actually contracted with Plaintiff Med-America Business Solutions, LLC, a North Carolina corporation. On March 17, 2004, Med-America filed a legal name change with the North Carolina Secretary of State, leaving Med South Health Plans, LLC as the successor in interest. (Compl. ¶ 1.) "LOTS does not concede that Med South has a right to assert Med-America[]'s rights . . . and reserves the right to assert this argument at a later time." (Def.'s Mem. of Law in Supp. of its Mot. to Dismiss Compl. 1 n.1 [hereinafter Def.'s Mem.].) Nonetheless, for purposes of the presently pending motions, this Court will refer to Plaintiffs collectively as "Med South."

On July 20, 2001, Med South contracted with LOTS to recruit agents to sell the "Value Med" series of LOTS' health, medical, and surgical ("HMS") insurance products. (Compl. ¶ 5.) On December 28, 2001, the parties executed a Marketing Exclusivity Addendum to the initial contract.[2] LOTS drafted and prepared each of these documents, which collectively formed the entire agreement between the parties ("Contract"). (*Id.*)

From 1997 to 2001, LOTS had been selling its HMS products on a low volume basis. (Compl. ¶ 6.) Prior to entering into the Contract, LOTS representatives met with Med South's owner to discuss the marketing and potential for increased sales of its HMS products. Med South projected that it would be able to produce a substantial increase in HMS sales, and LOTS repeatedly assured Med South that its operational staff would be able to handle the projected increase. (*Id.* ¶ 7.) The HMS products had been "marketed as guaranteed renewable, except in Georgia," and the proposed commission schedule provided to Med South "called for a 41% commission on new business and a 10% commission on renewals, plus other financial incentives." (*Id.* ¶¶ 6, 7.)

The Contract provided that Med South would operate on LOTS' behalf in South Carolina, Georgia, and Tennessee. (Compl. ¶ 8.) Med South's duties in those states included: "[1] recruiting soliciting

---

[2]The parties also executed an addendum on July 31, 2001. However, the second addendum "replace[d] the prior Addendum." (Ex. D to Am. Mot. to Dismiss Compl., Marketing Exclusivity Addendum to Recruiting General Agent Contract 1 [hereinafter Addendum].)

sub-agents to produce insurance business for LOTS, [2] receiving and accounting for all applications and initial premium payments, [3] forwarding all applications and premium payments to LOTS, and [4] providing certain accounting functions between Med South and its soliciting sub-agents." (*Id.*) In order to fulfill these duties, "Med South expended substantial sums in recruiting and training subagents and developing marketing schemes" for LOTS. (*Id.* ¶ 9.) "LOTS was at all times aware that Med South was devoting 100% of its time, energy and money to the promotion and sale of LOTS' HMS products[,]" and LOTS increased its own internal staffing to accommodate the increased volume of business. (*Id.* ¶¶ 13, 11.)

Between 2001 and 2003, Med South became one of the largest marketing producers for LOTS' HMS products: "[b]y March 2003, Med South had dramatically increased the sale of LOTS' HMS products, had established a network of approximately 992 sub-agents and had enlisted approximately 7,000 new clients for LOTS." (Compl. ¶¶ 9, 10.) LOTS continually advised Med South of its satisfaction with Med South's performance. (*Id.* ¶ 11.) In March 2003, at Med South's annual trip for top producers, LOTS representatives "praised" Med South for "keeping its word and increasing the sale of LOTS' HMS products." (*Id.* ¶ 13.) LOTS also announced plans for "a new '2003 Enhanced HMS plan'" in its March 2003 newsletter. (*Id.* ¶ 12.)

Effusive praise notwithstanding, on March 31, 2003, LOTS representatives verbally advised Med South that LOTS intended to stop

3

selling the HMS plans in all states. (Compl. ¶ 14.) LOTS claimed that it was unable "to comply with HIPAA electronic requirements," "the claim/loss ratios were . . . too high," the "re-insurers drop in rating was a concern," and it "had essentially lost interest in sales of the HMS products." (*Id.*) LOTS immediately sent letters to the affected insureds and subagents, and it unilaterally returned approximately $946,500.00 in premiums. (*Id.*) Med South made repeated attempts to convince LOTS to reverse its decision, but "LOTS steadfastly refused . . . and verbally ordered Med South to cease writing further business." (*Id.* ¶ 15.) Although LOTS eventually rescinded this verbal order, it advised Med South that "Med South could submit [only] a very small fraction of the business that Med South had been producing."[3] (*Id.* ¶ 17.) "To date, LOTS has never formally terminated the Contract." (*Id.*)

Med South claims that "LOTS' actions caused Med South to lose significant numbers of its sub-agents and clients, to the detriment of Med South and its reputation in the [insurance] industry." (Compl. ¶ 18.) Med South also alleges monetary damages resulting from lost commissions and its reasonable expenditures in marketing and selling LOTS' products. (*Id.* ¶ 19.) On August 31, 2007, Med South filed suit against LOTS asserting common law claims for breach

---

[3]Med South alleges that, "on information and belief," LOTS rescinded its verbal orders only "after receiving warnings from various Departments of Insurance that [LOTS] could not cease writing business" and that LOTS "could not exit the market in the manner in which [it] had been contemplating." (Compl. ¶¶ 17, 16.)

of contract, negligence, negligent misrepresentation, and tortious interference with contract, and a claim under O.C.G.A. § 10-1-372 for unfair and deceptive trade practices. (*See id.* ¶¶ 21-50.) LOTS now moves this Court to dismiss Med South's Complaint, pursuant to Federal Rule of Civil Procedure 12(b)(6), for failing to state a claim upon which relief may be granted.

## STANDARD OF REVIEW

In ruling on a motion to dismiss for failure to state a claim, the analysis "is limited primarily to the face of the complaint and attachments thereto." *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1368 (11th Cir. 1997) (per curiam). "However, where the plaintiff refers to certain documents in the complaint and those documents are central to the plaintiff's claim, then the Court may consider the documents part of the pleadings . . . and the defendant's attaching such documents to the motion to dismiss will not require conversion of the motion into a motion for summary judgment."[4] *Id.* at 1369. The Court still must "constru[e] the complaint in the light most favorable to the plaintiff and accept[] as true all facts which the plaintiff alleges." *Day*, 400 F.3d at

---

[4]Here, LOTS attached the documents comprising the Contract: (1) the July 20, 2001 Recruiting General Agent's Contract, (Ex. B. to Am. Mot. to Dismiss Compl., Recruiting General Agent's Contract [hereinafter RGA]); and (2) the December 28, 2001 Addendum. Since Med South refers to each of these documents in the Complaint, they are central to the asserted claims, and neither party challenges the authenticity of the documents, the Court will consider them as part of the pleadings. *See Day v. Taylor*, 400 F.3d 1272, 1275-76 (11th Cir. 2005); *Brooks*, 116 F.3d at 1369.

1275.  "Of course, 'a formulaic recitation of the elements of a cause of action will not do.'"  *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295 (11th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, __ U.S. __, 127 S. Ct. 1955, 1965 (2007)).  A complaint must include sufficient factual allegations "to raise a right to relief above the speculative level" and "to raise a reasonable expectation that discovery will reveal evidence of" the plaintiff's claim or claims.  *Id.* at 1295, 1296 (quoting *Twombly*, 127 S. Ct. at 1965) (internal quotation marks omitted).  However, "Rule 12(b)(6) does not permit dismissal of a well-pleaded complaint simply because 'it strikes a savvy judge that actual proof of those facts is improbable[.]'"  *Id.* at 1295 (quoting *Twombly*, 127 S. Ct. at 1965).

DISCUSSION

## I.  Breach of Contract

Med South first claims that LOTS breached "several explicit and implicit terms of the Contract[.]"  (Compl. ¶ 25.)  In order to sustain a breach of contract claim and survive LOTS' 12(b)(6) motion, Med South must allege facts showing that LOTS breached the Contract and that Med South suffered damages as a result of such breach.  LOTS argues that Med South failed to state a claim for breach of contract because the terms of the Contract, and Med South's own pleadings, directly contradict each of the alleged breaches.

A.   Express Breach

Med South first alleges that LOTS breached the express provisions of ¶ 1B and ¶ 2 of the RGA by "not pay[ing] 'first-year and renewal commissions,' because [LOTS] unilaterally returned close to $1 million in premium payments that [Med South] had provided," and by "refus[ing] to accept approximately 386 applications for insurance, and return[ing] premiums in the amount of $946,500.97." (Compl. ¶ 25a & c.)  The relevant provisions of the RGA provide as follows:[5]

> [Med South] is authorized to recruit Agents and Brokers to sell insurance and annuities on behalf of [LOTS] so long as [Med South] is properly licensed and abides by the law and the terms of this contract.
>
> . . .
>
> [LOTS] agrees to pay overriding first year and renewal commissions on business sold by the Agents and Brokers appointed by [Med South].  Such commissions will be in accordance with the Schedule of Commissions . . . .
>
> Commissions set forth in any Schedule of Commissions are payable only upon payment of premiums which are due. If a premium is refunded by [LOTS] for any reason, [Med South] will refund any amount paid to [Med South] with respect to that premium.  Any Schedule of Commissions is subject to change at any time upon notice to [Med South] by [LOTS] and will be applicable to business sold after the effective date of such change.  [LOTS] reserves the right to discontinue or add plans of insurance and to set the commission rates on new plans.

(RGA ¶¶ 1B, 2.)  LOTS asserts that Med South failed to state a claim for express breach of contract because the RGA explicitly provides

---

[5]To the extent that the subsequent addendum conflicts with the terms of the RGA, such conflict "shall be ruled and resolved by the terms of the [RGA]."  (Addendum 1.)

that (1) LOTS has "the right to discontinue . . . plans of insurance" and (2) Med South is not entitled to commissions on any "premium [that] is refunded by [LOTS] *for any reason*." (*Id.* ¶ 2 (emphasis added).)

"The construction of a contract is a question of law for the court." O.C.G.A. § 13-2-1; *see also Foshee v. Harris*, 170 Ga. App. 394, 395, 317 S.E.2d 548, 549 (1984). In Georgia, the starting point in contract construction is "to look to the four corners of the instrument to determine the intention of the parties from the language employed." *Livoti v. Aycock*, 263 Ga. App. 897, 901-02, 590 S.E.2d 159, 164 (2003). If the language of the agreement is "'clear, unambiguous, and capable of only one reasonable interpretation, no construction is necessary or even permissible [by the trial court].'" *Estate of Sam Farkas, Inc. v. Clark*, 238 Ga. App. 115, 120, 517 S.E.2d 826, 830 (1999) (quoting *Reahard v. Ivester*, 188 Ga. App. 17, 19, 371 S.E.2d 905, 907 (1988)) (alteration in original); *accord Jones v. Barnes*, 170 Ga. App. 762, 765, 318 S.E.2d 164, 167 (1984). "'Ambiguity in a contract is defined as duplicity, indistinctness or an uncertainty of meaning or expression.'" *Thomas v. B&I Lending, LLC*, 261 Ga. App. 39, 41, 371 S.E.2d 631, 634 (2003) (quoting *Horwitz v. Weil*, 275 Ga. 467, 468, 569 S.E.2d 515, 516 (2002)) (internal citation omitted). "[T]he existence or non-existence of ambiguity in a contract is a question of law for the court." *Foshee*, 170 Ga. App. at 395, 317 S.E.2d at 549.

Med South does not allege that the language of the Contract is unclear, ambiguous, or capable of multiple interpretations.[6] It is clear from "the four corners of the instrument" that LOTS had a contractual right to discontinue the HMS plan. (RGA ¶ 2); *Livoti*, 263 Ga. App. at 901-02, 590 S.E.2d at 164. Moreover, the RGA clearly provides that Med South is not entitled to "any amount . . . with respect to [any] premium" that "is refunded by [LOTS] for any reason."[7] (RGA ¶ 2.) Since "[a] cause of action cannot be brought against a party to a contract for exercising its contractual rights[,]" *Beasley v. Agricredit Acceptance Corp.*, 224 Ga. App. 372, 374, 480 S.E.2d 257, 260 (1997), Med South failed to state a claim for breach of the Contract's express terms.

### B. Breach of Implied Term

Med South next alleges that LOTS breached several implied terms of the Contract. Med South's claim, in effect, is that LOTS failed to satisfy its implicit obligation to create and maintain an internal

---

[6]Med South does argue that "to the extent that there is any ambiguity it should be construed against [LOTS]" as the drafter of the Contract. (Pl.'s Br. in Opp. To Def.'s Am. Mot. to Dismiss Compl. 3 (citing O.C.G.A. § 13-2-2(5); *C&S/Sovran Corp. v. First Fed. Sav. Bank of Brunswick*, 266 Ga. 104, 106, 463 S.E.2d 892, 894 (1995); *Dep't of Trans. v. Arapaho Constr., Inc.*, 257 Ga. 269, 270, 357 S.E.2d 593, 594 (1987)) [hereinafter Pl.'s Br.].) However, this statement of the law is not sufficient to state a claim for breach of contract where the language of the contract at issue is *not* ambiguous.

[7]There is no allegation that LOTS failed to pay earned commissions on any policy that remained in force—i.e., those on which LOTS collected premium payments.

operational structure sufficient to process the increased volume of business that Med South provided.[8]

In Georgia, "whatever may be fairly implied by the terms of the agreement is . . . embodied in the agreement." *Orkin Exterminating Co. v. Buchanan*, 108 Ga. App. 449, 452, 133 S.E.2d 635, 637 (1963). However,

> the introduction of an implied term into the contract
> . . . can only be justified when the implied term is not
> inconsistent with some express term of the contract and
> where there arises from the language of the contract

---

[8]Med South specifically alleges the following with respect to LOTS' implied duties under the Contract:

. . .

b)      [LOTS] . . . failed to implement an operational structure which could adequately process and handle the underwriting, service and claims-handling on the large volume of business produced by [Med South] and its subagents.

. . .

d)      [LOTS] made several express and implied promises as to how it would improve the service component which was inadequate for the amount of business that [Med South] was generating, and which service component was an implied term of the contract; [LOTS] breached all of those promises. Although [LOTS] did increase its staffing, [LOTS] was still unable to accurately and efficiently process the applications, and commission payments resulting therefrom.

e)      On or about March 31, 2003, without warning, [LOTS] informed [Med South] that it had unilaterally decided to stop selling its insurance plans in several states; this announcement came approximately 19 months after [Med South] and [LOTS] had entered into the Contract, and after [Med South] had spent hundreds of thousands of dollars in startup and performance expenses in order to perform its obligations under the Contract.

(Compl. ¶ 25.)

> itself, and the circumstances under which it was entered into, an inference that it is absolutely necessary to introduce the term to effectuate the intention of the parties.

*Regional Pacesetters, Inc. v. Eckerd Drugs of Ga., Inc.*, 183 Ga. App. 196, 197, 358 S.E.2d 481, 483 (1987) (internal quotation marks and citation omitted). At this stage in the litigation, for purposes of the present motion, the Court will assume that Med South alleged sufficient facts to support its claim that LOTS owed an implied duty to maintain an operational structure sufficient to accommodate the increase in HMS sales. *See Buchanan*, 108 Ga. App. at 452, 133 S.E.2d at 637 ("One who undertakes to accomplish a certain result agrees by implication to do everything to accomplish the result intended by the parties."). The Court will further assume, at this stage, that such implied duty "is not inconsistent with [the] express term[s]" and is "necessary to . . . effectuate the intention of the parties." *Regional Pacesetters*, 183 Ga. App. at 197, 358 S.E.2d at 483. Even making these assumptions regarding the *existence* of an implied duty, however, Med South failed to state a claim for *breach* of this obligation.

First, the express provision permitting LOTS to "discontinue" the HMS plan necessarily limited any implied duties associated with the maintenance of that plan. Additionally, Med South failed to allege that LOTS breached an implied duty during the relevant time period—i.e., after the formation of the Contract, but before LOTS exercised its right to discontinue the HMS plan. In fact, Med South

11

specifically alleges that during this relevant time period, "the relationship worked well and Med South substantially increased the business of LOTS." (Compl. ¶ 10.) Since LOTS did not owe any duties with respect to the HMS plan upon exercising its right to discontinue the plan, Med South cannot recover for a breach that allegedly occurred *after* LOTS no longer owed the underlying obligation. Quite simply, Med South failed to allege any facts which "raise a right to relief above the speculative level" or "raise a reasonable expectation that discovery will reveal evidence of" an actual breach. *Watts*, 495 F.3d at 1295, 1296 (internal quotation marks and citation omitted). Med South's reliance upon "'conclusory allegations, unwarranted deductions of facts [and] legal conclusions masquerading as facts'" does not state a claim for the breach of an implied term of contract; for this reason, this claim cannot survive LOTS' 12(b)(6) motion.[9] *Snow v. DirecTV, Inc.*, 450 F.3d 1314, 1320 (11th

---

[9]Med South also failed to state a claim with respect to its allegation that LOTS "demonstrated a lack of diligence, and interfered with, or failed to cooperate in [Med South]'s performance of the [C]ontract." (Compl. ¶ 26.) It is true that, in Georgia, an action for breach of contract is available "[w]here a party to a contract for an agreed exchange of performances knowingly prevents, hinders, or makes more costly the other's performance[.]" *Farmers Warehouse of Pelham, Inc. v. Collins*, 220 Ga. 141, 146, 137 S.E.2d 619, 623 (1964) (internal quotation marks and citation omitted). "The breach is of an implied promise against prevention." *Id.* The law carves out an exception, however, "where the action which hinders the other's performance was permitted by the express or implied terms of the contract, so that the risk of its non-happening was a risk that was assumed by the plaintiff." *Id.* (internal quotation marks, citation & emphasis omitted). Here, Med South alleges that LOTS hindered its ability to perform under the Contract by (1) discontinuing the HMS plan and (2) returning premiums and refusing to pay commissions on such premiums. The risk that LOTS would exercise each of these rights clearly "was a risk that was assumed by [Med South]" under the express provisions of the RGA. *Id.* Therefore, Med South failed to state a claim

12

Cir. 2006) (quoting *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002)).

C.   Implied Duty of Good Faith & Fair Dealing

Med South's final breach of contract claim is that LOTS breached its implied duty of good faith and fair dealing.   In Georgia, "[e]very contract implies a covenant of good faith and fair dealing in the performance of the terms of the agreement." *Camp v. Peetluk*, 262 Ga. App. 345, 350, 585 S.E.2d 704, 708 (2003).   This duty requires parties "to perform substantially within the spirit and letter of a contract." *Stuart Enters. Int'l, Inc., v. Peykan, Inc.*, 252 Ga. App. 231, 233, 555 S.E.2d 881, 883 (2001).   However, it is well-settled that the implied duty of good faith does not stand independent of the terms of the underlying contract; instead, "[t]he implied covenant of good faith modifies, and becomes part of, the provisions of the contract itself.   As such, the covenant is not independent of the contract." *Id.* at 234, 555 S.E.2d at 884.   Thus, when a plaintiff cannot prevail on its underlying breach of contract claim, that plaintiff also "cannot prevail on a cause of action based on the failure to act in good faith in performing the contract." *Heritage Creek Dev. Corp. v. Colonial Bank*, 268 Ga. App. 369, 374, 601 S.E.2d 842, 847 (2004); *see also Stuart Enters.*, 252 Ga. App. at 234, 555 S.E.2d at 884.

---

for breach "of an implied promise against prevention." *Id.*

Here, Med South simply alleges that "[i]n breaching the Contract as described . . . , [LOTS] also breached its implied duty of good faith and fair dealing." (Compl. ¶ 26.) Put differently, Med South contends that the breach constitutes bad faith. However, the Court has already determined that LOTS did not breach any of the Contract's express or implied terms. *See supra* Part **I.**<u>A.</u> & <u>B.</u> Furthermore, Med South failed to allege any facts which could sustain a breach of contract based upon LOTS' bad faith actions in exercising its rights under the Contract. Since Med South failed to allege facts supporting LOTS' alleged bad faith performance, and since Med South cannot sustain a general bad faith claim disconnected from any breach of contract, Med South's claim for breach of the covenant of good faith performance also fails as a matter of law.

## II. Negligence

### A.   General Negligence

Med South next alleges that it suffered damages as a result of LOTS' negligent breach of certain duties it owed to Med South. Specifically, Med South claims that LOTS negligently breached its duties to (1) "[e]xercise reasonable diligence and prudence in being able to deal with the increase in business generated by [Med South]" and (2) "[p]roperly manage its exit strategy in terminating the insurance plans that had been sold by [Med South] and its subagents so as to prevent or minimize damage to [Med South]." (Compl. ¶ 34a & b.) LOTS argues that Med South failed to state a claim for

14

negligence because "Med South's 'negligence' is solely premised on LOTS' alleged ability or duty to perform under the Contract." (Def.'s Mem. at 9.)

In Georgia, "[i]t is axiomatic that a single act or course of conduct may constitute not only a breach of contract but an independent tort as well[.]" *Gillis v. Orkin Exterminating Co.*, 172 Ga. App. 507, 507, 323 S.E.2d 695, 695 (1984). However, "a mere breach of a valid contract amounting to no more than a failure to perform in accordance with its terms does not constitute a tort or authorize the aggrieved party to elect whether he will proceed ex contractu or ex delicto." *Ga. Farm Bureau Mut. Ins. Co. v. Croley*, 263 Ga. App. 659, 663, 588 S.E.2d 840, 844 (2003) (internal quotation marks and citation omitted); *accord Lane v. Corbitt Cypress Co.*, 215 Ga. App. 388, 389, 450 S.E.2d 855, 857 (1994). Instead, "in order to maintain an action ex delicto because of a breach of duty growing out of a contractual relation[,] the breach must be shown to have been a breach of a duty imposed by law and not merely the breach of a duty imposed by the contract itself." *Mauldin v. Sheffer*, 113 Ga. App. 874, 879-80, 150 S.E.2d 150, 154 (1966); *accord Constr. Lender, Inc. v. Sutter*, 228 Ga. App. 405, 409, 491 S.E.2d 853, 858 (1997).

Med South failed to allege that LOTS breached any duty "imposed by law and not merely the breach of a duty imposed by the contract itself." *Mauldin*, 113 Ga. App. at 879-80, 150 S.E.2d at 154. Thus,

Med South failed to state a claim for negligence and LOTS is entitled to have this claim dismissed as a matter of law.

### B. Negligent Misrepresentation

Med South also asserts a claim for negligent misrepresentation. In order to state a claim for negligent misrepresentation, a plaintiff must allege: "'(1) the defendant's negligent supply of false information to foreseeable persons, known or unknown; (2) such persons' reasonable reliance upon that false information; and (3) economic injury proximately resulting from such reliance.'" *J.E. Black Constr. Co. v. Ferguson Enters.*, 284 Ga. App. 345, 348, 643 S.E.2d 852, 855 (2007) (quoting *Hardaway Co. v. Parsons, Brinckerhoff, Quade & Douglas, Inc.*, 267 Ga. 424, 426, 479 S.E.2d 727, 729 (1997)); *see also Benefit Support, Inc. v. Hall County*, 281 Ga. App. 825, 835, 637 S.E.2d 763, 772-73 (2006).

Here, Med South claims that LOTS negligently misrepresented that "it had the staff and technical capability to accurately and efficiently process insurance applications . . . and commission payments" and that "it was in compliance with, or would be able to comply with, . . . insurance regulations." (Compl. ¶ 39a & b.) Med South also alleges that LOTS "misrepresented its reasons for discontinuing the various insurance plans being marketed and sold by [Med South]." (*Id.* ¶ 39c.) LOTS asserts that none of these allegations are sufficient to state a claim for negligent misrepresentation, and the Court agrees.

First, to the extent that Med South relies upon the alleged misrepresentations regarding LOTS' reasons for discontinuing the HMS plan, Med South failed to allege (1) that it took any action in reliance on these misrepresentations or (2) that it suffered an "economic injury proximately resulting from such reliance." *J.E. Black*, 284 Ga. App. at 348, 643 S.E.2d at 855. Second, to the extent this claim is premised upon statements made *after* the execution of the Contract, Med South failed to allege that it took any action in reliance on such statements independent from its obligations under the Contract itself. Thus, to survive the present motion, Med South must allege facts sufficient to support a claim for fraudulent inducement with respect to the Contract.[10]

Generally, a party who asserts a claim for fraudulent inducement has two available remedies: (1) "promptly rescind the contract after discovering the fraud and sue in tort for recovery of the contract's consideration"; or (2) "affirm the contract and sue for damages resulting from the fraud." *Lakeside Invs. Group, Inc. v. Allen*, 253 Ga. App. 448, 451, 559 S.E.2d 491, 494 (2002). If the party resolves to affirm the contract, however, that party "is bound by [the

_____

[10]Med South cannot recover damages based upon alleged misrepresentations made *before* the execution of the Contract because the Contract constitutes the final agreement between the parties. (*See* RGA; Addendum.) Thus, fraudulent inducement is the only possible remaining theory of recovery—i.e., that LOTS intended to induce Med South to enter into the Contract through false representations upon which Med South justifiably relied to its detriment. *See*, *e.g.*, *JarAllah v. Schoen*, 243 Ga. App. 402, 403-04, 531 S.E.2d 778, 780 (2000).

contract's] terms, including the provisions of a merger clause." *Id.* "Indeed, '[t]he presence of a merger clause is determinative if the defrauded party has not rescinded but has elected to affirm the contract.'" *Id.* (quoting *G. Mansour, Inc. v. Mansour's, Inc.*, 233 Ga. App. 7, 9, 503 S.E.2d 304, 307 (1998)) (alteration in original).

Med South chose not to rescind the Contract and thus is bound by the merger clause, which reads: "This Addendum, along with the [RGA] and Schedule of Commissions, contains the entire agreement of the parties, and no representations, inducements, promises or agreements, oral or otherwise not embodied herein shall be of any force and effect." (Addendum ¶ X.) Given the presence of a valid merger clause, Med South cannot argue that it relied upon any representations other than those contained in the Contract. *See Ekeledo v. Amporful*, 281 Ga. 817, 819, 642 S.E.2d 20, 22 (2007) ("In essence, a merger clause operates as a disclaimer of all representations not made on the face of the contract."); *WirelessMD, Inc. v. Healthcare.com Corp.*, 271 Ga. App. 461, 469, 610 S.E.2d 352, 359 (2005) ("[B]ecause WirelessMD has not rescinded the contract, its fraud claim cannot survive unless it can show misrepresentations by Healthcare . . . that are actually contained in the Purchase Agreement."). Since the face of the Contract lacks any express promises on the part of LOTS that "it had the staff and technical capability to accurately and efficiently process insurance applications . . . and commission payments" or that "it was in

18

compliance with, or would be able to comply with, . . . insurance regulations," (Compl. ¶ 39a & b), the plain language of the Contract defeats Med South's claim of negligent misrepresentation based upon pre-Contract representations. Therefore, the Court grants LOTS' motion with respect to the negligent misrepresentation claim.

## III. Tortious Interference

LOTS also contends that Med South failed to state a claim for tortious interference. In order to state a claim for tortious interference with contractual relations, business relations, or potential business relations, Med South must plead facts to support the following elements:

> (1) improper action or wrongful conduct by [LOTS] without privilege; (2) [LOTS] acted purposely and with malice with the intent to injure; (3) [LOTS] induced a breach of contractual obligations or caused a party or third parties to discontinue or fail to enter into an anticipated business relationship with [Med South]; and (4) [LOTS'] tortious conduct proximately caused damage to [Med South].

*J. Kinson Cook of Ga., Inc. v. Heery/Mitchell*, 284 Ga. App. 552, 556-57, 644 S.E.2d 440, 446 (2007) (quoting *Dalton Diversified v. AmSouth Bank*, 270 Ga. App. 203, 208-09, 605 S.E.2d 892, 897-98 (1998)). Since the allegations in the Complaint are not sufficient to support the first element—that LOTS engaged in improper actions or wrongful conduct *without privilege*—Med South's claims for tortious interference cannot withstand the 12(b)(6) motions.

Med South claims that LOTS interfered with both present and potential future contracts between Med South and its subagents.

19

Specifically, Med South claims that LOTS, "purposely and with malice and with the intent to injure," induced the subagents to breach their contracts with Med South by (1) "[c]ontacting those subagents and policyholders enrolled by [Med South] . . . and advising them that [LOTS] would no longer be offering the insurance products promised" and (2) "negotiat[ing] and ostensibly reach[ing] an agreement with [another company], which completely severed [Med South]'s legal relationship with its subagents and customers, . . . destroyed [Med South]'s rights to commissions," and "rendered worthless [Med South]'s investment in its contractual obligation with [LOTS.]" (Compl. ¶¶ 30, 29a-c; *see also id.* ¶ 47a-c.) Even assuming the truth of these allegations, it is well-settled that "'[t]he defendant must be a stranger to both the contract at issue and the business relationship giving rise to and underpinning the contract; thus, all parties to an interwoven contractual arrangement cannot be liable for tortious interference with any of the contracts or business relationships that underlie such contractual arrangement.'" *J. Kinson Cook*, 284 Ga. App. at 557, 644 S.E.2d at 446. (2007) (quoting *Dalton Diversified*, 270 Ga. App. at 209, 605 S.E.2d at 898). The allegations in Med South's Complaint make it clear that the contracts between Med South and its subagents were part of "an interwoven contractual arrangement" to sell LOTS' HMS products. *Id.* Since LOTS is not "a stranger to . . . the business relationships that underlie [the contracts at issue]," *id.*, there is no set of facts under which

20

Med South could prevail on a claim against LOTS for tortious interference.

## IV.  Unfair & Deceptive Trade Practices

Med South's final claim against LOTS is a claim for deceptive trade practices under Georgia's Uniform Deceptive Trade Practices Act ("UDTPA"), O.C.G.A. § 10-1-370 *et seq*.  Under the UDTPA, a person may be liable for engaging in a deceptive trade practice when, in the course of his business, he:

> (1) [p]asses off goods or services as those of another; (2) [c]auses likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services; (3) [c]auses likelihood of confusion or of misunderstanding as to affiliation, connection, or association with or certification by another; (4) [u]ses deceptive representations or designations of geographic origin in connection with goods or services; (5) [r]epresents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he does not have; (6) [r]epresents that goods are original or new if they are deteriorated, altered, reconditioned, reclaimed, used, or secondhand; (7) [r]epresents that goods or services are of a particular standard, quality, or grade or that goods are of a particular style or model, if they are of another; (8) [d]isparages the goods, services, or business of another by false or misleading representation of fact; (9) [a]dvertises goods or services with intent not to sell them as advertised; (10) [a]dvertises goods or services with intent not to supply reasonably expectable public demand, unless the advertisement discloses a limitation of quantity; (11) [m]akes false of misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions; or (12) [e]ngages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

O.C.G.A. § 10-1-372(a). Med South failed to allege which of these subsections LOTS allegedly violated, and so the Court must attempt to discern whether Med South's allegations state *any* claim for deceptive trade practices.

Med South claims that LOTS violated the UDTPA by:

a)    [d]eceptively representing . . . that it had the capability to . . . process insurance applications sold by [Med South], . . .

b)    [d]eceptively representing . . . that it was in compliance with, or would be able to comply with, the insurance regulations of the several States . . . as well as federal HIPAA regulations . . . [, and]

c)    [d]eceptively concealing . . . until on or about March 31, 2003 the fact that [it] was planning on repudiating the contract under which plaintiff was performing in good faith . . . .

(Compl. ¶ 44.) Put differently, Med South contends that LOTS violated the UDTPA by (1) representing that it could do something that it could not do and (2) concealing its intent to repudiate the Contract. These alleged actions, however, clearly do not constitute the type of "deceptive trade practices" covered by the UDTPA. *See* O.C.G.A. § 10-1-372(a). Furthermore, Med South seeks to recover "*damages* for LOTS' . . . unfair and deceptive acts or practices in the insurance industry, including treble damages and attorney's fees." (Compl. ¶ 55 (emphasis added).) Under the UDTPA, however, injunctive relief is the only available remedy, and Med South certainly failed to allege that it "is likely to be damaged" by LOTS' allegedly deceptive trade practices in the future. O.C.G.A. § 10-1-

373; *see also Catrett v. Landmark Dodge, Inc.*, 253 Ga. App. 639, 644, 560 S.E.2d 101, 106 (2002); *Moore-Davis Motors, Inc. v. Joyner*, 252 Ga. App. 617, 619, 556 S.E.2d 137, 140 (2001); *Friedlander v. HMS-PEP Prods.*, 226 Ga. App. 123, 124, 485 S.E.2d 240, 241 (1997). Since Med South failed to allege facts that would permit recovery on a claim for deceptive trade practices under the UDTPA, this claim is subject to dismissal under Rule 12(b)(6).

CONCLUSION

For reasons stated herein, the Court grants Defendant Life of the South Insurance Company's Motion to Dismiss Complaint (Doc. 3) and Amended Motion to Dismiss Complaint (Doc. 4).

IT IS SO ORDERED, this 19th day of May, 2008.

S/Clay D. Land      <br>CLAY D. LAND<br>UNITED STATES DISTRICT JUDGE